**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**THOMAS PAYNE**                                                                    **PLAINTIFF**

**V.**                                              **CIVIL ACTION NO. 1:12-CV-41-KS-MTP**

**THE UNIVERSITY OF SOUTHERN
MISSISSIPPI, et al.**                                                    **DEFENDANTS**

<u>M</u>EMORANDUM <u>O</u>PINION AND <u>O</u>RDER

For the reasons stated below, the Court **grants in part, denies in part, and presently declines to address in part** Defendants' Motions for Summary Judgment [104, 106].

**I –– Background**

Thomas Payne was a tenured associate professor in the criminal justice department of the University of Southern Mississippi ("USM"). He alleges that Defendants subjected him to various adverse employment actions during his employment by the University, including, but not limited to, the denial of promotion, adverse annual performance reviews, the denial of permission to engage in outside employment, and the receipt of a notice that his contract would not be renewed. He alleges that some of the actions were in retaliation for filing grievances and EEOC charges, and that some were motivated by his religious beliefs.

Martha Saunders was the President of the University during most of the events leading to this case, and Robert Lyman was the Provost. Joe Whitehead was

the Dean of the College of Science & Technology for a portion of the relevant time period. Dale Ledford was first the chair of the Criminal Justice Department, and then the Associate Dean of Science & Technology. Lisa Nored succeeded Ledford as chair of the criminal justice department. Defendants filed motions for summary judgment [104, 106], which are ripe for review.

## II – Discussion

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). "Where the burden of production at trial ultimately rests on the nonmovant, the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (punctuation omitted). The nonmovant "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (punctuation omitted). "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc.*, 627 F.3d at 138. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra*, 626 F.3d at 812.

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). When deciding

whether a genuine fact issue exists, "the court must view the facts and the inference to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

Plaintiff asserted a wide variety of claims. Liberally construing the Complaint, the Court finds that Plaintiff pleaded the following causes of action:

- Section 1983 claim for violation of his right to procedural due process;

- Section 1983 claim for violation of his right to substantive due process;

- Section 1983 claim for violation of his right to Equal Protection;

- Section 1983 claim for violation of his First Amendment right to be free from retaliation for protected speech;

- Section 1983 claim for violation of his First Amendment right to association;

- Title VII retaliation;[1]

- Title VII hostile work environment;

- breach of contract;[2]

---

[1]    While the elements of each claim differ, retaliation is actionable under both Title VII and Section 1983. *See Shelton v. Bd. of Supervisors of S. Univ. & Agric. & Mech. College*, 532 F. App'x 558, 562 (5th Cir. 2013). Plaintiff's First Amendment retaliation and Title VII retaliation claims concern separate events. According to the Complaint, Plaintiff's First Amendment retaliation claim arises from Defendants' actions in response to his religious speech, while the Title VII retaliation claim arises from Defendants' actions in response to his grievances and EEOC charges.

3

- misrepresentation;

- negligent and intentional infliction of emotional distress; and

- negligence.

Plaintiff also listed a series of Defendants' actions/inactions from which these causes of action arise, but Plaintiff did not specify in the Complaint which Defendants committed which actions. Plaintiff apparently asserts all causes of action against all Defendants.[3]

In briefing, Plaintiff mentioned a Section 1983 claim for violation of his First

---

[2]    Plaintiff also asserted "claims" of equitable estoppel, promissory estoppel, and detrimental reliance. "These doctrines are means by which a party may be precluded from asserting contract defenses such as lack of consideration or the statute of frauds," and they are not separate from his breach of contract claim. *Weible v. Univ. of S. Miss.*, 89 So. 3d 51, 67-68 (Miss. Ct. App. 2011).

[3]    The Court is repeatedly forced to admonish litigants for "a shotgun approach to pleadings," in which "the pleader heedlessly throws a little bit of everything into his complaint in the hopes that something will stick." *S. Leasing Partners, Ltd. v. McMullen*, 801 F.2d 783, 788 (5th Cir. 1986); *see also Ward v. Life Investors Ins. Co. of Am.*, 383 F. Supp. 2d 882, 889 (S.D. Miss. 2005); *Austin v. Bayer Pharms. Corp.*, No. 5:13-CV-28-KS-MTP, 2013 U.S. Dist. LEXIS 137480, at *5 n. 1 (S.D. Miss. Sept. 25, 2013); *BC's Heating & Air & Sheet Metal Works, Inc. v. Vermeer Mfg. Co.*, No. 2:11-CV-136-KS-MTP, 2012 U.S. Dist. LEXIS 24420, at *27 (S.D. Miss. Feb. 27, 2012). In fact, the Fifth Circuit has observed that "shotgun pleading" of this sort treads dangerously close to Rule 11 territory. *McMullan*, 801 F.2d at 788 ("If Rule 11 is to mean anything and we think it does, it must mean an end to such expeditionary pleadings.").

Vague, imprecise "shotgun" pleading clouds the legal and factual issues in a case. At best, it indicates an attorney's failure to fully analyze the case and adopt a coherent defense or theory of liability. At worst, it constitutes intentional obfuscation. Regardless of the attorney's motivation, it escalates the cost of litigation for both the parties and the Court, requiring voluminous discovery and motions to pinpoint the specific issues for trial – a task that Rule 11 assumes attorneys perform, to some degree, before they file a pleading. *See* FED. R. CIV. P. 11(b)(2).

Amendment right to the free exercise of religion, a Title VII discrimination claim, and claims of constructive discharge under both Section 1983 and Title VII. None of these claims were asserted in the Complaint. "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005).

## II.A – Section 1983

"Section 1983 provides a cause of action for persons who have been 'depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws' of the United States by the actions of a person or entity operating under color of state law. *Kovacic v. Villareal*, 628 F.3d 209, 213 (5th Cir. 2010) (citing 42 U.S.C. § 1983). Plaintiff asserted a variety of claims under Section 1983, and Defendants offered a variety of arguments for summary judgment. The Court will attempt to address all of the arguments presented in Defendants' initial briefs. *Johnson v. Watkins*, 803 F. Supp. 2d 561, 575 n. 3 (S.D. Miss. 2011) (the court does not consider arguments raised for the first time in reply).

## II.A.1 – USM & Individuals in their Official Capacities

First, Defendants argue that USM and the individual Defendants in their official capacities are not "persons" within the meaning of Section 1983. It is well-settled that states and state agencies are not "persons" subject to suit under § 1983. *Cheramie v. Tucker*, 493 F.2d 586, 587 (5th Cir. 1974). This rule extends to

public universities, *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 821 (5th Cir. 2007), and public employees sued in their official capacities, as an official capacity claim is asserted "against the official's office" and "is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). "A suit is not against a state, however, when it seeks prospective, injunctive relief from a state actor, in her official capacity, based on an alleged ongoing violation of the federal constitution." *K. P. v. Leblanc*, 729 F.3d 427, 439 (5th Cir. 2013); *see also Salcido v. Univ. of S. Miss.*, No. 13-60444, 2014 U.S. App. LEXIS 2711, at *15 (5th Cir. Feb. 13, 2014).

Therefore, the Court grants Defendants' motions for summary judgment as to Plaintiff's Section 1983 claims against USM, and as to Plaintiff's Section 1983 claims for money damages against the individual Defendants in their official capacities, but it denies the motions with respect to Plaintiff's Section 1983 claims for prospective injunctive relief against the individual Defendants in their official capacities.

## II.A.2 – First Amendment Retaliation

Plaintiff claims that Defendants retaliated against his religious speech with a variety of adverse employment actions. Defendants argue that the speech in question is not protected by the First Amendment because it was pursuant to Plaintiff's official duties as a professor. The Fifth Circuit has summarized the relevant law:

> [G]overnment employees are not stripped of their right to freedom of expression by virtue of their employment. This right is not absolute, though, and we utilize a four-pronged test to determine whether the speech of a public employee is entitled to constitutional protection. A plaintiff must establish that: (1) he suffered an adverse employment

6

> decision; (2) his speech involved a matter of public concern; (3) his
> interest in speaking outweighed the governmental defendant's interest
> in promoting efficiency; and (4) the protected speech motivated the
> defendant's conduct. In 2006, the Supreme Court added what we have
> characterized as a "threshold layer" to the second prong of the
> retaliation test. Under this prong, "when public employees make
> statements pursuant to their official duties, the employees are not
> speaking as citizens for First Amendment purposes, and the
> Constitution does not insulate their communications from employer
> discipline." While the court must consider factual circumstances to
> determine whether speech is official, the determination is still a
> question of law. Functionally, this threshold layer has transformed our
> test, inserting an additional prong at which we consider whether the
> speech was pursuant to the employee's duties or as a citizen.

*Gibson v. Kilpatrick*, 734 F.3d 395, 400 (5th Cir. 2013) (citing *Garcetti v. Ceballos*,

547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006); *Connick v. Myers*, 461 U.S.

138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563,

88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)).

A graduate student employed in a program administered by Plaintiff, Lacey

Stewart, made an informal complaint [104-2] about Plaintiff. Among other things,

she complained: "Sometimes during conversations with Dr. Payne, religion or Bible

verses are usually brought up by him in some way. This makes me and others very

uncomfortable. . . . While in Scotland with CJA staff, Dr. Payne made the statement

that anyone who is not a Christian is going to hell."[4] She continued: "I have been told

to go pray about certain issues when they are being discussed with Dr. Payne

---

[4]     The Court is not considering Stewart's complaint as evidence of the
truthfulness of the matter asserted therein. *See* FED. R. EVID. 801(c). Rather, it is
considering the complaint as evidence that such a complaint was lodged with the
University. Plaintiff has not objected to consideration of the document for that
purpose.

7

numerous times. . . . I do not feel comfortable when told to go pray from my supervisor instead of dealing with the situation." She asserted "that this is very inappropriate in a work environment. This is disregarding to everyone's feelings especially knowing we have an international student of Hindu background involved in the conversation." And Stewart claimed that she felt "that if we do not agree with Dr. Payne's interpretation of Christianity and the Bible that we are looked down upon."

After Stewart submitted her complaint, Plaintiff was called to a meeting on February 9, 2009. The attendees were: Plaintiff; Rebecca Woodrick, the University's EEO Director; Defendant Lisa Nored, Plaintiff's Department Chair; and Defendant Dale Ledford, the Associate Dean of Science and Technology. It is undisputed that the general purpose of the meeting was to warn Plaintiff against making potentially offensive religious statements in the workplace.

Plaintiff admits that he openly discussed his religious beliefs with students. In fact, he admitted in an email to Woodrick [106-1] that the facts alleged by Stewart were true, although he disagreed with Stewart's assessment of the appropriateness of the behavior. Some of the disputed speech occurred in the classroom, while some of it occurred in one-on-one conversations. He testified: "I felt like I could tell my students from an evangelistic standpoint . . . that I would pray for them."[5] He further stated: "[A]s a Christian, I am called to be an evangelical. . . . [B]y that I mean whien

---

[5]    Transcripts of Plaintiff's depositions are attached as Exhibits 1 and 2 to Plaintiff's Response [117-1, 117-2] to the University Defendants' Motion for Summary Judgment.

I am asked about my faith, that I stand up for my faith and that I tell people about my faith, which is appropriate and not illegal." Later in the deposition, he continued: "I didn't inappropriately invoke my Christian faith to anybody. The only time that I would do that was when there was a general discussion. It was more of an evangelical rather than a proselytizing." In a grievance [117-9] filed with the University after the February 2009 meeting, he claimed the meeting had a "chilling effect" on his "first amendment right to express [his] Christian walk in the workplace."

Plaintiff apparently argues that the First Amendment[6] permits him to engage in any religious speech he desires without reprisal, even within the context of his employment as a professor at a public university. But "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Gibson*, 734 F.3d at 400. Speech is made pursuant to official duties if it "owes its existence to the employee's professional responsibilities." *Garcetti*, 547 U.S. at 421. Plaintiff wholly failed to address this issue in his briefing, but the evidence demonstrates that all of the speech at issue[7]

---

[6]     In briefing, Plaintiff attempted to transform his speech claim into a free exercise claim, claiming that Defendants retaliated against him because of his religious beliefs and practices. The only First Amendment rights mentioned in the Complaint [1-2] are the rights of free speech and association. "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera*, 429 F.3d at 113. Therefore, no free exercise claim is currently before the Court.

[7]     The Court emphasizes that Plaintiff's First Amendment retaliation claim and his Title VII retaliation claim concern different speech – at least according to the Complaint [1-2]. The former concerns Plaintiff's religious speech in the context of his

took place pursuant to Plaintiff's duties as a professor at the University. Therefore, the speech was not protected from employer discipline, and the Court grants Defendants' motions for summary judgment as to Plaintiff's First Amendment retaliation claim.[8]

## II.A.3 – Due Process

Plaintiff claims that Defendants committed both procedural and substantive due process violations. Procedural due process requires that a party deprived of a life, liberty, or property interest be provided "notice and an opportunity to be heard . . . at a meaningful time and in a meaningful manner." *Gibson v. Tex. Dep't of Ins. – Div. of Workers' Comp.*, 700 F.3d 227, 239 (5th Cir. 2012). "[F]or a person to have a procedural due process claim that damages or other relief can remedy, he must have been denied life, liberty, or property protected by the Fourteenth Amendment." *Wilson v. Birnberg*, 667 F.3d 591, 597 (5th Cir. 2012).

"Substantive due process bars certain arbitrary, wrongful government actions

---

role as a professor at the University. The latter concerns Plaintiff's "protected activity," as defined by Title VII.

[8]    *Cf. Savage v. Gee*, 665 F.3d 732, 738-39 (6th Cir. 2012) (librarian's suggestion of a book to a faculty member was not protected speech because it was pursuant to his duties); *Gorum v. Sessoms*, 561 F.3d 179, 186 (3rd Cir. 2009) (professor's assistance of student at disciplinary hearing was speech pursuant to his duties as a public employee and unprotected speech); *D'Angelo v. Sch. Bd.*, 497 F.3d 1203, 1210-11 (11th Cir. 2007); *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007) (high school athletic director's memoranda concerning funds appropriated for athletic activities was not protected speech); *Piggee v. Carl Sandberg College*, 464 F.3d 667, 671-72 (7th Cir. 2006) (instructor/student relationship does not end once class is over; speech to student outside the classroom was not protected); *Nichols v. Univ. of S. Miss.*, 669 F. Supp. 2d 684, 698-99 (S.D. Miss. 2009) (statements made in the classroom by a professor were not protected).

regardless of the fairness of the procedures used to implement them." *Lewis v. Univ. of Tex. Med. Branch*, 665 F.3d 625, 630 (5th Cir. 2011). It "requires only that public officials exercise professional judgment, in a nonarbitrary and noncapricious manner, when depriving an individual of a protected property interest." *Id.* at 631. Like procedural due process, substantive requires a plaintiff to show that he was deprived of a legitimate entitlement – a life, liberty, or property interest protected by the Fourteenth Amendment. *Id.* at 630.

Property or liberty interests may be "created and defined by existing rules or understandings that stem from an independent source such as state law," *Wilson*, 667 F.3d at 598, including the policies and procedures of public universities. *Bd. of Regents v. Roth*, 408 U.S. 564, 578, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). "Mississippi courts have held that contract rights constitute enforceable property rights." *Whiting v. Univ. of S. Miss.*, 451 F.3d 339, 345 (5th Cir. 2006) (citing *Univ. of Miss. Med. Ctr. v. Hughes*, 765 So. 2d 528, 536 (Miss. 2000)). Mississippi courts have also "held that employee manuals become part of the employment contract, creating contract rights to which employers may be held . . . ." *Id.* (citing *Robinson v. Bd. of Trustees of E. Cent. Junor Coll.*, 477 So. 2d 1352, 1353 (Miss. 1985)). Therefore, "where a property right to procedural protections existed under state law, those procedural guarantees constitute a property interest protected under due process." *Id.*

"No discretion in the official and a reasonable expectation in the citizen are the

central elements" of a due process entitlement. *Hampton Co. Nat'l Sur. LLC v. Tunica County, Miss.*, 543 F.3d 221, 226 (5th Cir. 2008)."[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Ridgely v. FEMA*, 512 F.3d 727, 735 (5th Cir. 2008).

## II.A.3.a – Notice of Non-Renewal

First, Plaintiff claims that Defendants deprived him of procedural and substantive due process by sending him notice that his contract would not be renewed. Defendants argue that the notice did not deprive Plaintiff of any protected life, liberty, or property interest.

On August 25, 2010, Defendant Lyman, then the Provost and Vice-President of Academic Affairs, sent Plaintiff a letter [117-37] notifying him that the Gulf Coast campus Criminal Justice program would be discontinued, and that his contract would not be renewed at the conclusion of the 2010-2011 academic year. The notice was rescinded in a second letter to Plaintiff [106-4] on March 1, 2011. It is undisputed, therefore, that Plaintiff was not terminated in 2010 – despite his repeated misrepresentations of a "termination" in briefing. Indeed, the University did not discontinue the Gulf Coast campus Criminal Justice program, and Plaintiff never experienced a break in employment until he resigned in December 2012.

Procedural and substantive due process claims require that a plaintiff have been denied a life, liberty, or property interest protected by the Fourteenth Amendment. *See Wilson*, 667 F.3d at 597 (procedural due process); *Lewis*, 665 F.3d at

630 (substantive due process). The rescinded notice of non-renewal did not deprive Plaintiff of any life, liberty, or property interest, and the Court grants Defendants' motions for summary judgment as to any procedural or substantive due process claim arising from it.

## II.A.3.b -- Outside Employment

Next, Plaintiff contends that Defendants deprived him of due process by denying him permission to engage in outside employment during academic years 2008-2009, 2009-2010, 2010-2011, and 2011-2012. Defendants argue that Plaintiff had no protected interest in the permission to engage in outside employment.

The IHL Board of Trustees Policies & Bylaws [104-1] provide:

> Members of the faculty and staff are permitted to engage in outside employment, provided permission is first obtained from the executive officer of the institution concerned and, provided further, that the executive officer of the institution concerned shall grant permission to engage in outside employment only after having first determined that the said outside employment will interfere in no way with the institutional duties of the individual requesting such permission.

The IHL bylaws, therefore, expressly condition the right to engage in outside employment upon receipt of permission from the University's President after her determination that the outside employment will not interfere with the applicant's institutional duties. Phrased differently, the University President possesses sole discretion as to whether a faculty member should be permitted to engage in outside employment.

Accordingly, the Court finds that Plaintiff enjoyed no due process entitlement

13

to permission to engage in outside employment. *See Hampton*, 543 F.3d at 226 (no discretion in the official is a central element of a due process entitlement); *Salcido v. USM*, No. 13-60444, 2014 U.S. App. LEXIS 2711, at *7 (5th Cir. Feb. 13, 2014) (where department handbook provided faculty with complete discretion to determine who qualified for clinical hours, there was no property interest in such hours). The Court grants Defendants' motions for summary judgment as to Plaintiff's procedural and substantive due process claims arising from the denial of permission to engage in outside employment.

## II.A.3.c -- Denials of Promotion

Plaintiff also claims that Defendants deprived him of due process by failing to promote him to full professor in 2006, 2008, and 2012. Defendants argue, among other things, that Plaintiff had no protected life, liberty, or property interest in a promotion. Before the Court considers this argument, it must set out the procedures for awarding academic promotions.

The faculty handbook [104-13] provides: "Promotion in academic rank is not guaranteed by any terms of contracted employment or earned solely by the duration of employment. No oral or written promise of promotion in academic rank shall be valid unless approved by the Board [of Trustees] and written notification is received from the President confirming the Board approval." While all "employment decisions regarding promotion . . . must ultimately be made by the Board of Trustees," "recommendations for promotion . . . normally originate at the department level."

Faculty members "wishing to be evaluated for promotion in academic rank must prepare and submit their dossiers to the chair of the academic department in which they hold academic appointment," and they "may supplement their dossiers with additional relevant information before the Personnel Committee completes its evaluation of the candidate."

"Upon receipt of promotion dossiers, department chairs must first confirm the eligibility of applicants for promotion in academic rank and then convene the Departmental Promotion Committees to consider the qualifications of candidates for promotion. Departmental Promotion Committees consist of departmental faculty members holding academic rank equal to, or higher than, that being sought by candidates for promotion." "Although not formally members of the Departmental Promotion Committee, department chairs may be invited to attend the promotion proceedings and act as information sources." The Departmental Promotion Committee must base its "deliberations on the standards for promotion mandated by the Board of Trustees, the standards governing promotion adopted by the University, and the standards for promotion adopted by the colleges and departments in which candidates for promotion hold academic appointment . . . ." It may also consider "recommendations and evaluations submitted by external sources." The Departmental Promotion Committee prepares a written report recommending or declining to recommend promotion and providing a rationale for the recommendation. It then submits the report to the department chair, who reviews it

15

for substantive discrepancies, prepares his or her own written recommendations, submits both reports to the dean, and provides written notice to the applicant of these actions.

The dean then submits the applicants' dossiers to the College Advisory Committee, along with "written recommendations of Departmental Promotion and Tenure Committees and department chairs." The College Advisory Committee reviews the materials, votes, and its chair provides a written recommendation and rationale for the vote to the dean and the applicant. The dean "must review and evaluate all materials considered by the College Advisory Committee, department chairs, and Departmental Promotion and Tenure Committees, thereafter submitting to the Provost a separate recommendation, along with all evaluative materials." At the same time, the dean provides written notice of these actions, with supporting rationale, to the College Advisory Committee, department chairs, Departmental Promotion and Tenure Committee, and the applicant.

Once the Provost receives these materials, he "submits the dossiers of faculty members being considered for promotion . . . to the University Advisory Committee. The Vice President for Research assists the Provost in these matters and may submit independent recommendations to the University President." "The University Advisory Committee reviews and evaluates all materials and then votes, the chair of the committee tendering written recommendations and rationale for the vote to the Provost with a copy to the applicant." "Assisted by the Vice President for Research,

16

the Provost reviews all application materials on the record and submits written recommendations to the President," sending copies to the University Advisory Committee, deans, College Advisory Committee, department chair, Departmental Promotion and Tenure Committee, and the applicant.

The President reviews the "recommendations of subordinate institutional personnel bodies and administrative officers," and she "has the discretion to obtain and review any additional evidence of probative value and to interview any party, including applicants." The President provides the applicant written notice of her decision. Positive decisions are recommended to the Board of Trustees. Negative decisions are final unless appealed by the applicant to the Board of Trustees.

Defendants provided several arguments pertaining to Plaintiff's due process claims arising from the denials of promotion. The Court need only address one of them, Defendants' argument that the denial of promotion did not deprive Plaintiff of any life, liberty, or property interest protected by the Fourteenth Amendment. Indeed, the handbook specifically provides that promotion in academic rank is not guaranteed, and the decision ultimately rests within the sole discretion of the Board of Trustees. The lengthy application and review process – which involves many different committees, officials, reports, and recommendations – further demonstrates the uncertainty of its outcome. No reasonable faculty member could review these procedures and conclude that there exists an entitlement to promotion in academic rank.

The Court finds, therefore, that Defendants' denials of Plaintiff's application for promotion did not deprive him of any protected life, liberty, or property interest.[9] Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's substantive and procedural due process claims arising from it.

## II.A.3.d -- Annual Performance Reviews

Plaintiff claims that Defendants violated his right to procedural and substantive due process by providing him with unfavorable annual performance reviews for calendar years 2008 and 2009. Before the Court considers Defendants' arguments, it must set out the procedures for faculty evaluations.

---

[9] The Court further notes that Plaintiff has not alleged or presented any evidence that Defendants materially deviated from the handbook's provisions or otherwise failed to provide him with any procedure required by the faculty handbook. Likewise, he has not presented any evidence that the failures to promote him to full professor were arbitrary or capricious. He simply disagrees with the outcome. The record [106-3, 106-4] demonstrates that Defendants complied with the procedures outlined in the handbook, and that their decisions were not arbitrary or capricious.

With respect to the 2006 denial of promotion, Plaintiff withdrew his application after receiving unfavorable recommendations from the departmental committee and department chair, but before it had progressed to the Provost.

In 2007-2008, Plaintiff applied once again. Three different outside professors – one of whom was selected by Plaintiff – reviewed Plaintiff's dossier and recommended that he should not be promoted to full professor. Based on these reports, the departmental committee unanimously recommended that Plaintiff should not be promoted. Defendant Nored, as the criminal justice department chair, agreed based on the reports from the departmental committee and external reviewers. The consistent theme throughout the reports was that Plaintiff's record demonstrated a lack of scholarly productivity, particularly in the area of peer-reviewed publications.

Plaintiff applied for promotion once again in 2011-2012. An internal committee of three USM professors recommended against his promotion, as did three external professors who reviewed his application materials. As in previous years, the reviewers consistently cited Plaintiff's failure to publish scholarly articles in peer-reviewed publications.

18

According to the faculty handbook [104-13] each academic department forms a Departmental Personnel Committee, which conducts annual performance reviews. That does not appear to have been the case in the criminal justice department at the time in question. The typical practice at the time was for the department chair to conduct annual performance reviews, but Plaintiff had filed a grievance against his department chair, Defendant Nored. Therefore, Defendant Gandy, the Dean of Science and Technology, conducted the review for calendar year 2008, while Defendant Whitehead, interim Dean of Science & Technology, conducted the review for calendar year 2009. Plaintiff does not contend that the performance of his review by the Dean – rather than a Departmental Personnel Committee – constitutes a due process violation.

The annual performance reviews must address "the faculty member's (i) past and present performance; (ii) professional progress; and (iii) future expectations." They cover three categories of evaluation – research, teaching, and service – and they consist of two stages, the "information stage" and the "appraisal stage."

In the "information stage," "the faculty member has the opportunity to provide information to the Department Personnel Committee regarding the employee's professional growth and accomplishments during the evaluation period," including an annual activity report, curricula vitae, any other additional supporting materials, and a written statement of professional goals for the upcoming year. "The information process must be based on objective evidence," and the "evaluators may

give each item of objective evidence the weight they deem appropriate for the relevant department and the particular faculty member's responsibilities."

The second stage of the process is the "appraisal stage, focusing on personal and professional strengths and weaknesses affecting employment and establishing goals and objectives to be pursued by employees during upcoming evaluation period." The Departmental Personnel Committee evaluates the faculty member based on "information provided by the faculty member, peer evaluators, and such other objective or subjective information the committee deems relevant." The evaluation is put in an Annual Performance Review Report.

When a faculty member is found deficient in any area of an evaluation, the Departmental Personnel Committee, department chair, and faculty member shall jointly prepare a Faculty Development Plan which explains the nature and extent of the deficiencies, as well as the actions necessary to remedy them. The plan must state "reasonable expectations to be achieved within a reasonable and specific time period," and the "Departmental Personnel Committee and department chair must periodically review the faculty member's performance" to see if they are making progress. While the evaluators and faculty member "must strive to reach agreement on professional goals and objectives," if they can not agree, "the goals and objectives established by Departmental Personnel Committees constitute the official basis for future evaluation in the absence of successful appeals . . . ."

After completion of the report, the Departmental Personnel Committee

20

submits it to the department chair. The department chair reviews it for discrepancies, prepares his own independent written recommendations, and submits all of the above to the dean, providing copies to the faculty member. Annual Performance Reviews are "not institutional recommendations for personnel actions and thus may not be appealed to the Board of Trustees." They are, however, "precursors of future recommendations for personnel actions, and faculty are therefore afforded recourse through the Faculty Grievance Proceedings . . . ."

The briefing does not clearly identify the specific annual performance reviews of which Plaintiff complains. The Court will assume – based on the evidence – that Plaintiff's complaints center on the performance reviews for calendar years 2008 and 2009. The Court discerns three complaints in Plaintiff's briefing concerning the performance reviews, and it will address each one in turn.

## II.A.3.d.i — The Reviews' Outcomes

First, Plaintiff disagrees with the outcomes of the annual performance reviews; he believes that he deserved better evaluations than he received. The faculty handbook, however, does not include any section which entitles a faculty member to a favorable annual performance review. Indeed, the very idea of a performance review implies that the persons performing the review have discretion to provide the feedback they believe is merited, and no reasonable person could believe that the handbook sections described above entitle faculty members to favorable annual performance reviews. The Court finds, therefore, that Plaintiff has

no protected life, liberty, or property interest in the content of his annual performance reviews.

The Court further notes that both Gandy and Whitehead provided explanations [106-3, 106-4] for their conclusions, and their decisions were neither arbitrary nor capricious. Of course, Plaintiff has a higher opinion of his own professional achievements than they do, but he failed to offer any evidence that their conclusions were based on any impermissible motive or discriminatory intent.

## II.A.3.d.ii -- Nored and Ledford's Involvement

Second, Plaintiff complains that Defendants based the annual performance reviews on false and/or biased information provided to them by Defendants Nored and Ledford, against whom he had previously filed a grievance. Plaintiff contends that this false and/or biased input corrupted the review process and rendered the conclusions of the annual performance reviews arbitrary and capricious. But Plaintiff failed to present any evidence that the reviews were based on false and/or unfairly prejudicial information. This claim is based solely on speculation and conjecture, and while Plaintiff obviously disagrees with Defendants' evaluations of his job performance, he has not provided any evidence that their conclusions or the information upon which they were based were false, arbitrary, and/or capricious. The Court further notes that Plaintiff failed to identify any handbook provision entitling him to an annual performance review process different than the ones which he received. Accordingly, the Court finds no procedural or substantive due process

violation arising from Nored and Ledford's limited input for the annual performance reviews.

**II.A.3.d.iii – Delay**

Finally, Plaintiff claims that Defendant Whitehead violated his substantive or procedural due process rights by delaying the completion of his review for calendar year 2009. In the spring of 2009, Defendant Lyman, the Provost, asked Defendant Whitehead, the Interim Dean of Science and Technology, to conduct Plaintiff's annual performance review for calendar year 2009. Whitehead recalls exchanging emails with Plaintiff about the evaluation in March and April of 2010. Whitehead completed the review in January 2012. He explained the delay: "During this same time, I was heavily involved in the process of complying with a directive from USM President, Dr. Martha Saunders, to look into ways that all of the colleges at USM could save money."

The faculty handbook provides that annual performance reviews "must be conducted annually between January 15 and March 15," and the "calendar year immediately preceding an Annual Performance Review will normally constitute the period under review." The only other mention of time periods or deadlines occurs after the initial preparation of the report. After the department chair receives the report from Departmental Personnel Committee, he must submit it to the dean by March 15.

The review process typically employed in the criminal justice program at the

relevant time varied from the handbook insofar as there was no Departmental Personnel Committee. Plaintiff's annual review process veered further from the handbook insofar as the dean conducted his reviews, rather than his department chair. Regardless of who was performing the evaluation, though, the handbook contemplates that it should be completed by March 15 of the calendar year immediately preceding the one under review. Plaintiff's was not. The Court finds, therefore, that Plaintiff was deprived of the review procedure required by the handbook. The question remains whether the deprivation constituted a substantive or procedural due process violation.

Substantive due process "requires only that public officials exercise professional judgment, in a nonarbitrary and noncapricious manner, when depriving an individual of a protected property interest." *Lewis*, 665 F.3d at 631. Defendant Whitehead explained why he delayed the completion of Plaintiff's 2009 review, and Plaintiff has not presented any evidence contradicting the explanation. The reason provided by Whitehead was not arbitrary or capricious. Therefore, the delay did not constitute a substantive due process violation.

Procedural due process requires "notice and an opportunity to be heard . . . at a meaningful time and in a meaningful manner" before the deprivation of a protected property interest. *Gibson*, 700 F.3d at 239. The record contains no record of any notice and opportunity to be heard before Whitehead delayed completion of Plaintiff's review. Therefore, the Court denies Defendants' motions for summary judgment on

Plaintiff's procedural due process claim against Defendant Whitehead arising from the delay in completing the 2009 annual performance review.

The Court finally notes that the record contains no evidence that any of the other individual Defendants were involved in the delay of Plaintiff's 2009 annual performance review. "A Section 1983 claimant must establish that the defendant was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation." *Jones v. Lowndes* County, 678 F.3d 344, 349 (5th Cir. 2012); *see also Salcido*, 2014 U.S. App. LEXIS 2711, at *5-*6. Therefore, the Court grants summary judgment as to Plaintiff's procedural due process claim against Defendants Nored, Gandy, Ledford, Lyman, and Saunders arising from the delay in completing his 2009 annual performance review.

## II.A.3.e -- Grievances

Plaintiff contends that Defendants did not follow proper procedures when handling his internal grievances. Defendants argue that Plaintiff's internal grievances were terminated for his failure to follow the relevant University policies and procedures.

## II.A.3.e.i – 2/11/09 Grievance

Plaintiff filed his first grievance [106-5] on February 11, 2009. He claimed that the meeting with Woodrick, Defendant Ledford, and Defendant Nored about Lacey Stewart's complaint created a hostile work environment toward his religious beliefs. On November 30, 2009, Russ Willis, the Director of Human Resources, notified

[104-6] Plaintiff that the investigation was complete and that there was insufficient evidence to support Plaintiff's allegations of religious discrimination.

Defendants have not presented any evidence explaining what occurred during the nine-month gap between the filing of Plaintiff's grievance and Willis's written notice that the investigation was complete. The University Policies and Procedures [104-11] provide that upon receipt of a complaint, the director of AA/EEO must meet with the complainant. In this case, the director of AA/EEO – Woodrick – was implicated by the complaint, and Willis, the HR director, filled this role. Upon receipt of Plaintiff's complaint – which undisputedly states a potential violation of University civil rights policy – Willis was required to respond in writing to both the complainant and respondents within fifteen working days. Defendants did not provide any evidence that Willis either met with Plaintiff or provided a written response.

Accordingly, Willis failed to comply with the grievance procedures outlined in the University Policies and Procedures. However, "[a] Section 1983 claimant must establish that the defendant was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation." *Jones*, 678 F.3d at 349. Likewise, "a supervisory official may be held liable . . . only if (1) she affirmatively participates in the acts that cause the constitutional deprivation, or (2) she implements unconstitutional policies that causally result in the constitutional injury." *Wernecke v. Garcia*, 591 F.3d 386, 401 (5th Cir. 2009). Assuming that Willis's

failure to abide by the Policies and Procedures constitutes a due process violation, Plaintiff has not provided any evidence that the individual Defendants were causually connected to it. Therefore, the Court grants Defendants' motions for summary judgment with respect to Plaintiff's substantive and procedural due process claims arising from the February 2009 grievance.

## II.A.3.e.ii – 7/20/09 Grievance

Plaintiff filed his second grievance on July 20, 2009, claiming that Defendants Nored, Ledford, and Gandy had retaliated against him for filing the previous grievance by denying his application for permission to engage in outside employment and giving him an unfavorable annual performance review. Nored denied Plaintiff's application for permission to engage in outside employment on February 10, 2009 [106-1]. Gandy provided Plaintiff with his 2008 annual performance review report [106-3] on April 23, 2009. Therefore, Plaintiff failed to submit his grievance within thirty calendar days of the alleged discriminatory action as required by the University Policies and Procedures [104-11]. The Policies and Procedures also provide that any failure to comply with a time limit constitutes termination of the grievance. Accordingly, Defendants did not deprive Plaintiff of due process by terminating the grievance of July 20, 2009.

## II.A.4 – Equal Protection

Plaintiff claims that Defendants violated his right to equal protection under the law by treating him differently than other professors because of his religious

27

beliefs. Defendants argue that Plaintiff failed to provide any evidence that their decisions and actions were driven by discriminatory intent.

The Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985) (quoting U.S. CONST. amend. XIV, § 1). "States do not escape the strictures of the Equal Protection Clause in their role as employers." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 597, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008). "Under the equal protection clause, strict scrutiny applies to classifications that infringe on a fundamental right . . . or involve a protected classification." *A. M. v. Cash*, 585 F.3d 214, 226 (5th Cir. 2009). The free exercise of religion is a fundamental right, and religion is a suspect classification. *See* U.S. CONST. amend. I; *Yur-Mar, LLC v. Jefferson Parish Council*, 451 F. App'x 397, 401 (5th Cir. 2011). To maintain his equal protection claim, Plaintiff must "prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001).

It is not necessary for the Court to address each individual action by the Defendants which Plaintiff claims violated his right to equal protection. Plaintiff has not presented any evidence whatsoever that Defendants' actions "stemmed from discriminatory intent," and this claim is based on nothing but speculation and

conjecture. *Id.* Plaintiff points to the February 2009 meeting with Woodrick, Defendant Ledford, and Defendant Nored, in which they discussed a student's complaint about Plaintiff's admitted religious speech when interacting with students. No reasonable person could conclude that Ledford and Nored harbored discriminatory intent toward Christians because they investigated a student's complaints about Plaintiff's admitted attempts to evangelize his students.

Plaintiff may also assert a class-of-one theory of equal protection, but this theory "does not apply in the public employment context." *Engquist*, 553 U.S. at 598. As the Supreme Court explained:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be treated alike, under like circumstances and conditions is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id.* at 603. For all of the reasons stated above, the Court grants Defendants' motions for summary judgment as to Plaintiff's equal protection claims.

## II.A.5 – Qualified Immunity

All individual Defendants asserted a broad claim of qualified immunity from liability for any of Plaintiff's Section 1983 claims. After a defendant invokes the defense of qualified immunity, the plaintiff has the burden of proving its inapplicability. *Tolan v. Cotton*, 713 F.3d 299, 305 (5th Cir. 2013). The plaintiff must

show: "first, the official's conduct violated a constitutional or statutory right; and second, the official's actions constituted objectively-unreasonable conduct in the light of clearly established law at the time of the conduct in question." *Id.* "The second prong of the qualified immunity test is understood as two separate inquiries: whether the violated constitutional rights were *clearly established at the time of the accident*; and, if so, whether the defendant's conduct was *objectively unreasonable* in the light of that then clearly established law." *Id.* (punctuation omitted). The reasonableness of the defendant's actions must be judged from the perspective of a reasonable official in the same situation with the same knowledge. *Newman v. Guedry*, 703 F.3d 757, 762 (5th Cir. 2012).

The Court is unable to address the issue of qualified immunity without arguments focusing on the specific actions of which Plaintiff complains. The qualified immunity analysis requires consideration of the particular circumstances surrounding a public official's actions. *Id.* It is impossible for the Court to consider Defendants' qualified immunity defense because it is generally asserted as to all of Plaintiff's Section 1983 claims, without any specific analysis. Therefore, the Court presently declines to consider the issue of qualified immunity. If Defendants wish to raise this issue again before trial – addressing specific, discrete actions and the particular circumstances surrounding them – they may do so after the pretrial conference and hearing to be held next week.

One issue the Court may address, though, is Defendant Whitehead's delay of

Plaintiff's 2009 annual performance review. Plaintiff has not provided any evidence demonstrating that the delay was objectively unreasonable in light of the following undisputed facts: 1) Whitehead, the interim dean, would not have typically been the person to conduct Plaintiff's annual performance review; 2) at the same time, President Saunders had directed Whitehead to look into certain budgetary issues; and 3) the handbook [104-13] provides that annual performance reviews "will be scheduled at the convenience of all involved parties, taking into account teaching schedules, other University-related duties, and professional commitments." In the absence of evidence that the delay was objectively unreasonable, Whitehead enjoys qualified immunity for liability for any claim arising from the delay.

## II.A.6 – Sufficiency of Pleading

Defendants Nored, Whitehead, Ledford, and Gandy argue that Plaintiff's claims against them should be dismissed for failure to state a claim because Plaintiff failed to allege specific facts demonstrating that each of them violated any rights secured by federal law.

When a motion for summary judgment is based solely on the sufficiency of the pleadings, the motion should be evaluated in the same manner as a 12(b)(6) motion to dismiss. *Ashe v. Corley*, 992 F.2d 540, 544 (5th Cir. 1993). Defendants' motion for summary judgment is not based solely on the sufficiency of the pleadings, however. They presented evidence and a wide variety of fact-based arguments. The 12(b)(6) argument appears to have been included as a "catch-all" to cover any claims

remaining after the Court's disposition of their Rule 56 arguments.

In practical terms, Defendants want the Court to dismiss claims under Rule 12(b)(6) after it just found that there exist genuine disputes of material fact which preclude summary judgment. Defendants have not cited any authority establishing that this is the appropriate procedural posture for a 12(b)(6) motion. For that reason, the Court declines to consider this argument. *Gann v. Fruehauf Corp.*, 52 F.3d 1320, 1328 (5th Cir. 1995) (failure to properly brief a claim waives it); *Salcido*, 2014 U.S. App. LEXIS 2711 at *15 n.7.

## II.B – Title VII

### II.B.1 – Individual Liability

First, Defendants argue that the individual Defendants are not liable under Title VII. They are correct. "Individuals are not liable under Title VII in either their individual or official capacities." *Ackel v. Nat'l Communs., Inc.*, 339 F.3d 376, 381 n. 1 (5th Cir. 2003) (citing *Smith v. Amedisys Inc.*, 298 F.3d 434, 448-49 (5th Cir. 2002). Therefore, the Court grants Defendants' Motions for Summary Judgment as to any Title VII claims asserted against the individual Defendants.

### II.B.2 – Exhaustion of Administrative Remedies

Next, Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect to certain Title VII claims. Of course, "an employee may not base a Title VII claim on an action that was not previously asserted in a formal charge of discrimination to the EEOC, or that could not be reasonably expected to

32

grow out of the charge of discrimination." *Filer v. Donley*, 690 F.3d 643, 647 (5th Cir. 2012). "In order to file suit under Title VII, a plaintiff first must file a charge with the EEOC within 180 days of the alleged discriminatory act. If and once the EEOC issues a right-to-sue letter to the party who has filed the EEOC charge, that party has 90 days to file a Title VII action." *Price v. Choctaw Glove & Safety Co.*, 459 F.3d 595, 598 (5th Cir. 2006). These time periods act as statutes of limitation. *Hood v. Sears Roebuck & Co.*, 168 F.3d 231, 232 (5th Cir. 1999). The "question is whether the charge has stated sufficient facts to trigger an EEOC investigation, and to put an employer on notice of the existence and nature of the charges against him." *Simmons-Myers v. Caesars Entm't Corp.*, 515 F. App'x 269, 272-73 (5th Cir. 2013).

### II.B.2.a -- Hostile Work Environment

First, Defendants argue that Plaintiff failed to exhaust Title VII's administrative remedies with respect to a claim of hostile work environment. Plaintiff did not include any explicit charge of hostile work environment in his EEOC Charges [106-6, 106-7, 106-8]. In hostile work environment claims, though, "if one act alleged to have created the hostile work environment is timely exhausted, a court may consider the entire scope of the hostile work environment claim." *Filer*, 690 F.3d at 647. "To apply this continuing violation doctrine . . . the plaintiff must demonstrate that the separate acts are related." *Id.*

Plaintiff made no effort to demonstrate that an act related to his hostile environment claim was exhausted. In fact, he did not even address Defendants'

exhaustion argument. Therefore, the Court finds that his Title VII claim for a hostile work environment is barred for failure to exhaust administrative remedies.

## II.B.2.b -- Denial of Promotion

Defendants also argue that Plaintiff's Title VII claim of retaliatory denial of promotion is barred for failure to exhaust administrative remedies. Once again, Plaintiff failed to address this argument in briefing. Regardless, his EEOC charges [106-6, 106-7, 106-8] contain no mention of a promotion denial. Therefore, the Court finds that his Title VII claim for the same is barred for failure to exhaust administrative remedies.

## II.B.3 -- Title VII Retaliation

Title VII retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Royal v. CCC&R Tres Arboles, LLC*, 736 F.3d 396, 400 (5th Cir. 2013). First, "the employee must demonstrate a prima facie case of retaliation." *Id.* He must demonstrate that: (1) he engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *Id.* "Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Ackel*, 339 F.3d at 385.

In the second stage of the analysis, "the burden shifts to the employer, who must state a legitimate non-retaliatory reason for the employment action." *Royal*,

34

736 F.3d at 400. Defendant's burden is merely one of production, rather than persuasion; it involves "no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

In the final stage, the plaintiff must "establish that the employer's stated reason is actually a pretext for unlawful retaliation," *Royal*, 736 F.3d at 400, which the plaintiff "accomplishes by showing that the adverse action would not have occurred but for the employer's retaliatory motive." *Feist v. Louisiana*, 730 F.3d 450, 454 (5th Cir. 2013) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013)).

**II.B.3.a -- Outside Employment**

Defendants denied Plaintiff's application for permission to engage in outside employment on February 26, 2009 [106-1]. In September 2009, July 2010, and September 2011, Defendants granted the applications – but only up to 8-10 hours per week. Plaintiff claims that the full denial and the subsequent partial denials were retaliation for his grievances and EEOC charges. Defendants argue that Plaintiff can not demonstrate a causal connection between the denials and Plaintiff's protected activity.

Plaintiff presented sufficient evidence to make out a prima facie case of retaliation with respect to his applications for permission to engage in outside employment. In all four cases, Plaintiff had engaged in some protected Title VII activity prior to the adverse employment action. The February 2009 denial occurred

approximately two weeks after his grievance [117-9] of February 11, 2009. The 2009, 2010, and 2011 partial denials all occurred after he had filed EEOC charges and grievances [117-9, 117-13, 117-14, 117-15, 117-18]. In each of these charges and/or grievances, Plaintiff complained of perceived discrimination and/or retaliation. Therefore, he engaged in a protected activity. *See Ackel*, 339 F.3d at 385.

Next, it is undisputed that Defendants either fully or partially denied Plaintiff's applications for permission to engage in outside employment on the occasions listed above. To prove an "adverse employment action" in the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); *see also Mendoza v. Bell Helicopter*, No. 12-11053, 2013 U.S. App. LEXIS 23985, at *7-*8 (5th Cir. Dec. 2, 2013). A reasonable employee would certainly find the denial or limitation of permission to engage in outside employment to be materially adverse. Plaintiff satisfied this element.

Finally, Plaintiff has presented evidence of temporal proximity between the denials of permission to engage in outside employment and his protected activity. "[C]ases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity

36

must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001); *see also Leal v. McHugh*, 731 F.3d 405, 417 (5th Cir. 2013). The first denial, in February 2009, occurred approximately two weeks after Plaintiff filed a grievance. The September 2009 partial denial occurred one month after Plaintiff filed a grievance, and approximately three and a half months after Plaintiff filed an EEOC charge. The September 2011 partial denial occurred approximately three weeks after Plaintiff filed an EEOC charge. In the Court's opinion, these events were close enough to meet the prima facie requirement of causation.

As Plaintiff met his initial burden, Defendant must produce a legitimate, nondiscriminatory reason for the adverse employment actions. Among other reasons, Defendant claims that University policy limits outside employment to 8-10 hours per week, and that Plaintiff refused to provide them with the specific number of hours per week that he expected to be engaged in outside employment. This is a legitimate, nondiscriminatory reason.

In the last stage of the analysis, Plaintiff must prove that Defendants' stated reason for the denials is pretextual. One method Plaintiff may use to establish pretext is to show that Defendants' "proffered explanation is false or unworthy of credence." *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011).[10] Plaintiff

---

[10]     It is unclear what impact, if any, the Supreme Court's decision in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013), has on past Fifth Circuit opinions holding that pretext may be demonstrated by evidence that the employer's proffered reason is false. In *Nassar*, the Supreme Court held that Title VII requires proof that the adverse employment action would not have occurred *but*

testified that other professors routinely engaged in more than ten hours per week of outside employment. He also presented evidence [119-33] that past University administrators had approved applications in which he did not specify the number of hours to be spent in outside employment, but merely assured them that it would not interfere with his work.

In 2001, Plaintiff was appointed as a City Court Judge in Gulfport, Mississippi. He stated on the application: "The position will require daily attendance at Court. But will not interfere with my teaching load or other office hours at the University. I also have weekend hours at the Court." Administrators approved the application. On his 2002 application, he represented that he would be in court for half a day, twice a week, in addition to administrative duties. One of the vice-presidents – presumably in response to Plaintiff's application – expressed concern over Plaintiff's ability to adequately fulfill his teaching obligations along with his considerable outside responsibilities, but Plaintiff's application was still approved. In fact, he held the position of City Court Judge for approximately four years, and the University also approved his 2003 application for permission to

---

*for* a retaliatory motive. *Id.* at 2533; *see also Feist*, 730 F.3d at 454.

But *Nassar* involved post-judgment challenges to a jury's determination that retaliation was a motivating factor for an adverse employment action. *Nassar*, 133 S. Ct. at 2524. The *McDonnell Douglas* framework is an analytical tool used at the summary judgment stage and trial to determine the broad question of whether an employer retaliated against an employee because of his protected activity. After trial, it "becomes moot, and the question is whether legally sufficient evidence supported the jury's finding." *Adams v. Groesbeck Indep. Sch. Dist.*, 475 F.3d 688, 690-91 (5th Cir. 2007). Therefore, as *Nassar* involved post-trial motions, it arguably has no effect on Fifth Circuit cases addressing *McDonnell Douglas*'s pretext analysis.

engage in outside employment.

In the Court's opinion, this evidence is sufficient to create a genuine dispute of material fact as to whether Defendant's proffered reasons for denying Plaintiff's applications for permission to engage in outside employment are "false or unworthy of credence." *Vaughn*, 665 F.3d at 637. The record contains evidence that University administrators had approved Plaintiff's applications to engage in more than 8-10 hours of outside employment in the past. Plaintiff has met his pretext burden, and the Court denies Defendants' motions for summary judgment as to Plaintiff's Title VII retaliation claim for the denial of his applications for permission to engage in outside employment.

## II.B.3.b -- 2008 Annual Performance Review

Defendants argue that summary judgment is appropriate as to Plaintiff's Title VII retaliation claim arising from his 2008 Annual Performance Review. First, Defendants argue that the Court must defer to their professional judgment in reviewing Plaintiff's academic performance, citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985). *Ewing* concerned Section 1983 claims for the violation of rights secured by federal law, and Defendants have not cited any authority applying *Ewing* in the Title VII context. Therefore, the Court rejects this argument.

Defendants also argue that Plaintiff has not demonstrated that he suffered an injury as a result of receiving an unfavorable evaluation. Therefore, they contend

that his Title VII retaliation claim must be dismissed. While proof of injury may be necessary for Plaintiff to receive an award of damages, the Title VII retaliation analysis only requires that Plaintiff demonstrate "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68; *see also Mendoza*, 2013 U.S. App. LEXIS 23985 at *7-*8. A reasonable employee would find an unfavorable performance review materially adverse, particularly in the light of the handbook's provision that annual performance reviews are "precursors of future recommendations for personnel actions" for which "faculty are . . . afforded recourse through the Faculty Grievance Proceedings . . . ." For these reasons, the Court denies Defendants' motions for summary judgment with respect to Plaintiff's Title VII retaliation claim arising from his 2008 annual performance review.

### II.B.3.c -- Notice of Non-Renewal

Finally, Defendant argues that Plaintiff has no evidence of a causal link between Plaintiff's protected activity and the notice of non-renewal sent to Plaintiff in August 2010. The Court will assume that Plaintiff has demonstrated a prima facie case of retaliation with respect to the notice. Defendant proffered a legitimate, nondiscriminatory reason: declining financial support from the state and a recommendation from the University Priorities Committee that the Gulf Coast Campus criminal justice program be discontinued. *Cf. Bourgeois v. Miss. Valley State*

*Univ.*, 507 F. App'x 386, 388 (5th Cir. 2013) (reduction-in-force was legitimate reason for discharge) (citing *EEOC v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996)).

The burden shifts, therefore, to Plaintiff. He must demonstrate that Defendant's stated reason is mere pretext for retaliation. Plaintiff argued in briefing that there was no financial exigency, but he presented no evidence in support of this claim or to dispute Defendants' testimony [106-4] concerning declining financial support from the state. Beyond this, Plaintiff cites nothing more than his own belief and the temporal sequence of events as proof of pretext. These are not sufficient to prove a causal link between the notice of non-renewal and Plaintiff's protected activity. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012) (temporal proximity is not enough to prove pretext); *McCoy v. City of Shreveport*, 492 F.3d 551, 562-63 (5th Cir. 2007) (temporal proximity and subjective belief were not sufficient proof of pretext); *Lawrence v. Univ. of Tex. Med. Branch*, 163 F.3d 309, 313 (5th Cir. 1999) (subjective belief is not sufficient proof of pretext). Accordingly, the Court grants Defendants' motions for summary judgment as to Plaintiff's Title VII retaliation claim arising from the notice of non-renewal.

## II.C – State Law Claims

Defendants Nored, Whitehead, Ledford, and Gandy argue that all of their actions related to this case were conducted in the course and scope of their employment by the University, and that they enjoy sovereign immunity from liability

41

for Plaintiff's state law claims.

The Mississippi Tort Claims Act provides that a state employee "may be joined in an action against the governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties." MISS. CODE ANN. § 11-46-7(2). For the MTCA's purposes, "an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense." *Id*. As noted above, Plaintiff asserted the following state law claims: breach of contract, misrepresentation, negligent and intentional infliction of emotional distress, and negligence.

Torts which require proof of malice as an essential element are excluded from the MTCA's waiver of sovereign liability. *Zumwalt v. Jones County Bd. of Supervisors*, 19 So. 3d 672, 688-89 (Miss. 2009); MISS. CODE ANN. § 11-46-7(2). Therefore, the individual Defendants are not immune from liability for Plaintiff's claim for intentional infliction of emotional distress, to the extent it includes an element of malice. *See Franklin Collection Serv. v. Kyle*, 955 So. 2d 284, 290 (Miss. 2007); *Weible*, 89 So. 3d at 64.

The individual Defendants do, however, enjoy sovereign immunity from

liability for negligence-based claims – such as Plaintiff's claims of negligent infliction of emotional distress and negligence. *See* Miss. Code Ann. § 11-46-7(2); *Kermode v. Univ. of Miss. Med. Ctr.*, No. 3:09-CV-584-DPJ-FKB, 2010 U.S. Dist. LEXIS 82475, at *16 (S.D. Miss. July 2, 2010); *Gerald v. Univ. of S. Miss.*, No. 2:12-CV-147-KS-MTP, 2014 U.S. Dist. LEXIS 5019, at *87 (S.D. Miss. Jan. 15, 2014); *Klingler v. Univ. of S. Miss.*, No. 2:12-CV-150-KS-MTP, 2013 U.S. Dist. LEXIS 171515, at *54 (S.D. Miss. Dec. 5, 2013). They are also immune from liability for Plaintiff's breach of contract claim. *Kermode*, 2010 U.S. Dist. LEXIS 82475, at *16 (citing *Zumwalt*, 19 So. 3d at 688; *Depree v. Saunders*, 588 F.3d 282, 290-91 (5th Cir. 2009)). The Court further notes that the individual Defendants were not parties to Plaintiff's employment contract. Therefore, they could not have breached it.

As for Plaintiff's misrepresentation claim, it is not clear whether it concerns negligent or intentional misrepresentations. Regardless, the individual Defendants are immune from liability for negligent misrepresentations, but not intentional ones. *See* MISS. CODE ANN. § 11-46-7(2); *Zumwalt*, 19 So. 3d at 688.

## III -- Conclusion

For all of the reasons stated above, the Court **grants in part, denies in part, and presently declines to address in part** Defendants' Motions for Summary Judgment [104, 106]. Specifically:

1. The Court finds that Plaintiff did not plead a Section 1983 claim for violation of his First Amendment right to the free exercise of religion, a Title VII discrimination claim, or claims of constructive discharge under either Section 1983 and Title VII. Therefore, no such claims are currently before the Court.

43

2.  The Court grants Defendants' motions for summary judgment as to Plaintiff's Section 1983 claims against USM, and as to Plaintiff's Section 1983 claims for money damages against the individual Defendants in their official capacities.

3.  The Court denies the motions with respect to Plaintiff's Section 1983 claims for prospective injunctive relief against the individual Defendants in their official capacities.

4.  The Court grants the motions with respect to Plaintiff's First Amendment retaliation claims.

5.  The Court grants the motions with respect to Plaintiff's Substantive and Procedural Due Process claims arising from the 2010 notice of non-renewal, the denials of Plaintiff's applications for permission to engage in outside employment, and denials of Plaintiff's applications for promotion.

6.  The Court grants the motions with respect to Plaintiff's Substantive and Procedural Due Process claims arising from his annual performance reviews, except for the Procedural Due Process claim arising from the delay in conducting Plaintiff's 2009 annual performance review.

7.  The Court grants the motions with respect to Plaintiff's Substantive and Procedural Due Process claims arising from the processing of his internal grievances.

8.  The Court grants the motions with respect to Plaintiff's Equal Protection claims.

9.  The Court presently declines to address Defendants' qualified immunity arguments, except that it grants Defendant Whitehead's motion for qualified immunity with respect to Plaintiff's due process claims arising from the delay of his 2009 annual performance review.

10. The Court denies the motions with respect to 12(b)(6) arguments concerning sufficiency of the pleadings.

11. The Court grants the motions with respect to any Title VII claims asserted against the individual Defendants.

44

12. The Court grants the motions with respect to Plaintiff's Title VII claim for a hostile work environment.

13. The Court grants the motions with respect to any Title VII claim arising from the denials of promotion.

14. The Court denies the motions with respect to Plaintiff's Title VII retaliation claims arising from the denials of his applications for permission to engage in outside employment and his 2008 annual performance review.

15. The Court grants the motions with respect to Plaintiff's Title VII retaliation claim arising from the 2010 notice of non-renewal.

16. The Court grants the motions with respect to Plaintiff's state-law claims of breach of contract, negligence, negligent infliction of emotional distress, and negligent misrepresentation against Defendants Nored, Whitehead, Ledford, and Gandy.

17. The Court denies the motions with respect to Plaintiff's state-law claims of intentional infliction of emotional distress and intentional misrepresentation.

SO ORDERED AND ADJUDGED this 21st day of February, 2014.

*s/ Keith Starrett*

UNITED STATES DISTRICT JUDGE